IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

CARIBBEAN ENTERTAINMENT TECHNOLOGIES,
LTD., a Trinidad and Tobago limited liability company,

      Plaintiff,

vs.

SNAP ONE, LLC, d/b/a WIREPATH, SNAPAV, and
CONTROL4, f/k/a WIREPATH HOME SYSTEMS, LLC
a North Carolina limited liability company,

      Defendant.

_____/

## **COMPLAINT**

Plaintiff Caribbean Entertainment Technologies Limited ("***Plaintiff***" or "***CET***") files this Complaint against Snap One, LLC ("***Defendant***" or "***Snap One***") and states as follows:

### **Introduction**

1.      This is an action about a large, publicly traded U.S. company taking advantage of, and gravely harming, a small business based in Trinidad and Tobago. CET, through its work history and relationships in Trinidad and Tobago, had a lucrative opportunity to provide home-security products and services to the state-owned telecommunications company. CET brought this opportunity to Snap One—who would provide the hardware—on the condition that CET have the sole and exclusive right to provide this hardware to the telecommunications company. Snap One, which stood to make substantial money by suppling the hardware, agreed. Thereafter, CET spent substantial time, money, and effort over nearly 18 months to finalize this deal. But then, at the very last minute, Snap One allowed a different company to serve as the supplier of the subject hardware,

1

cutting CET out of the deal. This breached of the parties' agreement and violated applicable law. As a result, CET has suffered millions of dollars in damages.

## Jurisdiction, Parties, and Venue

2.      CET is a limited liability company incorporated in Trinidad and Tobago that maintains its principal place of business and "nerve center" in Trinidad and Tobago. CET's sole member is Aaron Rudden. Rudden is a citizen of Trinidad and Tobago and is a resident of and domiciled in Trinidad and Tobago. He has not been lawfully admitted to the United States for permanent residence.

3.      Snap One is a North Carolina limited liability company, which is authorized to do business in Florida. Snap One has its principal place of business and "nerve center" in North Carolina. Upon information and belief, Snap One is a wholly owned subsidiary of Snap One Holdings Corp., a Delaware corporation with its principal place of business and "nerve center" in North Carolina.

4.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs; CET is a foreign citizen for diversity purposes and is not lawfully admitted for permanent residence in any state; and Snap One is a citizen for diversity purposes of North Carolina and Delaware.

5.      The Court has personal jurisdiction over Snap One, which is registered to do business in Florida and actually does business in Florida. Snap One operated, conducted, engaged in, or carried on a business or business venture in Florida. Additionally, Snap One is engaged in substantial and not isolated activity within Florida, including serving as the exclusive wholesaler for a Florida manufacturing company's products. Moreover, acting through the Snap One Sales

Manager (as defined below), who was located in Florida at all relevant times, Snap One beached a contract and committed multiple tortious acts within Florida as set forth herein.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Snap One resides in Florida, a substantial part of the events or omissions giving rise to the claim occurred in this District, and Snap One is subject to the Court's personal jurisdiction with respect to this action within this District.

7.      This is an action for breach of contract, breach of implied-in-fact contract, unjust enrichment, breach of implied covenant of good faith and fair dealing, tortious interference, unfair competition, and constructive fraud, with an amount in controversy in excess of $75,000, exclusive of fees and costs.

8.       All conditions precedent to the maintenance of this action have occurred or otherwise been waived or would be futile.

9.      CET has retained undersigned counsel to represent it in this action and is required to pay counsel a reasonable fee for their services.

## Factual Allegations

10.     CET has extensive experience in the area of home automation and security solutions.

11.     As detailed herein, CET, through Rudden, had a relationship with Telecommunications Services of Trinidad and Tobago ("**TSTT**"), under which CET would provide certain home security products and services to TSTT (the "**Deal**").

12.     TSTT is the state-owned telecommunications company in Trinidad and Tobago. TSTT's services include providing home-security systems for its subscribers. In the Deal, TSTT acted as the purchaser or end-user of the hardware and related services.

13.     "Wirepath," "SnapAV," and "Control4" all refer to the same company, Snap One. Snap One was formerly known as Wirepath Home Systems, LLC. Snap One is the operating subsidiary of a large, publicly traded U.S. company. Simply, Snap One functioned as the wholesaler of the home security hardware ("**hardware**" or "**products**") that CET was, in turn, going to provide to TSTT.

14.     Rudden met Keino Cox ("**Cox**") on January 20, 2020. Cox served as "Chief e-Tender Services" or "procurement manager" at TSTT. Cox remained the contact person at TSTT for CET throughout the Deal's negotiation process.

15.     At that time, Cox expressed an interest in upgrading TSTT's alarms inventory for its existing home-security system subscriber base.

16.     That same day, Rudden emailed Nicholas Rosado of Snap One (the "**Snap One Sales Manager**") regarding the business opportunity with TSTT. In Rudden's initial email to the Snap One Sales Manager about the Deal, Rudden stated "I have a really nice opportunity . . . and it's a really good fit. . . . Significant size, budget in place[,] and looking like it will go sole select vender" (*i.e.*, will not be put out for a public bid):

> On Jan 20, 2020, at 7:29 PM, Aaron Rudden <aaronr@caribbeanav.com> wrote:
>
> Hi Nik, hope you are well, looking to get a call scheduled with you, I have a really nice opportunity came up here, and it's a really good fit for c4. Significant size, budget in place and looking like it will go sole select vendor.
>
> Let me know when is good to call
>
> Regards,
> Aaron

A copy of this email is attached as **Exhibit "A."**

17.     On February 6, 2020, Rudden formally met Cox and other TSTT representatives at the Trinidad and Tobago Energy Show 2020. That day, Rudden sent a follow-up email to Cox

describing CET's services. This email also mentioned that, during the day's meeting, Cox had expressed interest regarding modular, self-installed smart home and security starter kits.

18.     Before February 20, 2020, TSTT expressed an interest for the Deal not to go to a public bid and instead wanted the Deal to be handled as a "sole-select process," in which the contract could be awarded without a public bid. To qualify for a sole-select process, CET had to demonstrate that it had an exclusive relationship with Snap One to supply the hardware to TSTT.

19.     Thus, CET told Snap One about this requirement and made it clear that CET would only involve Snap One in the Deal if Snap One agreed that CET was the exclusive dealer for the hardware for government telecommunications sales and service in Trinidad and Tobago. Snap One agreed.

20.     On February 20, 2020, Rudden received a letter (the "***2020 Dealer Exclusivity Letter***") via email from the Snap One Sales Manager. A copy of this letter is attached as **Exhibit "B."**

21.     The 2020 Dealer Exclusivity Letter is dated February 19, 2020 and is addressed to Rudden. The letter is authored by a Snap One corporate attorney, Christopher Mortorff. The letter states that CET "is currently the exclusive Control4 [i.e., Snap One] dealer for government telecommunications sales and service in Trinidad and Tobago. As such, CET provides specialized support in telecommunications subscription products, service provider sales and support, assistance with government and telecommunications carriers, and related integration services." The letter also states that "CET is currently the exclusive provider of Clare-branded Clare One panel devices, and Control4 [*i.e.*, Snap One] is the exclusive provider of Clare products worldwide":

February 19, 2020

**VIA EMAIL**

Christopher Mortorff
Wirepath Home Systems, LLC
11734 S Election Rd,
Salt Lake City, UT 84020 USA
+1 801.619.4272 (Office)
+1 801.523.3199 (Fax)
cmortorff@control4.com

Aaron Rudden
President
Caribbean Entertainment Technologies, LLC
JGWJ+7G San Juan,
Trinidad and Tobago

Re:  Dealer Exclusivity Letter – Caribbean Entertainment Technologies

Mr. Rudden,

Wirepath Home Systems, LLC d/b/a Control4 ("Control4") sends this notice confirming that Caribbean Entertainment Technologies ("CET") is currently the exclusive Control4 dealer for government telecommunications sales and service in Trinidad and Tobago. As such, CET provides specialized support in telecommunications subscription products, service provider sales and support, assistance with government and telecommunications carriers, and related integration services. Additionally, CET is currently the exclusive provider for Clare-branded Clare One panel devices, and Control4 is the exclusive provider of Clare products worldwide.

If you, or any of your customers, have questions regarding this notice, please have them reach out to me through one of the contract methods above.

Best,

Christopher Mortorff
Senior Corporate Counsel
Wirepath Home Systems, LLC

22.     Snap One provided the 2020 Dealer Exclusivity Letter as part of the agreement between CET and Snap One that CET would be the sole and exclusive dealer for Snap One products, including Claire Controls products, in connection with government telecommunications sales and service in Trinidad and Tobago (the "***Exclusivity Agreement***").

23.     Snap One and CET agreed that the Exclusivity Agreement lasted as long as the Deal was being negotiated and through it being finalized and consummated.

6

24.     CET would not have involved Snap One in the Deal if Snap One had not entered into the Exclusivity Agreement.

25.     After receiving the 2020 Dealer Exclusivity Letter, CET presented it to TSTT as justification that TSTT could proceed to engage CET as the "sole select" vendor for the deal to avoid TSTT having to go through a public bid process.

26.     On February 20, 2020, Rudden presented the "Clare home security alarm product" in person to Cox in Trinidad. The Snap One Sales Manager and Brett Price, the CEO of Clare Controls, attended this presentation.

27.     Clare Controls is a Florida limited liability company that manufactured the hardware at issue in the Deal, for which Snap One was the exclusive wholesaler.

28.     Thereafter, CET and TSTT engaged in continued discussions regarding the Deal.

29.     On August 3, 2020, TSTT shared certain financial information relating to the Deal, which allows for an accurate computation of the money that would have been made by CET in the Deal.

30.     On August 5, 2020, at TSTT's request, Rudden sent Cox an overall quote for the Deal.

31.     The next day, on August 6, 2020, Cox responded to Rudden's August 5 email. A copy is attached as **Exhibit "C."** Cox informed Rudden that "approval has been provided [by TSTT] to proceed immediately with finalizing the Lease commercial model for execution." Cox noted that the lease model needed to be revised by CET to "change out the existing 13k customer base with options for targeted 20% growth in the 1st year . . . [and a] revised pricing . . . with volume incentives and reductions in the deployment commitment costs." In other words, in addition to the current subscribers, TSTT anticipated 20% growth per year.

32.     On September 9, 2020, Rudden sent his "executive summary" of the Deal to Cox.

The executive summary describes the fundamentals of the proposed deal as of that date:

Dear Sir,

Further to our meetings and needs analysis conducted over the past few months please find below our summary recommendation/offer for the upgrade and expansion of the existing TSTT security services subscriber base.

CET, TSTT and Control 4 shall jointly develop a cobranded product that allows for direct exchange of existing hardware at subscriber residences and buildings. The deployment and fulfillment shall be done by CET in cooperation with TSTT, keeping all TSTT branding in all subscriber relations. The hardware and related support services shall be designed from the ground up to allow for subscriber self-installation deeply reducing the instance of site visit and truckroll services.

All software, backend maintenance, subscriber mobile app and operational management of hardware health and status at subscriber homes shall be provided by CET and Control4, again all branded as TSTT related services

TSTT will commit to an initial 15,000 alarm panels and related edge devices to allow for the direct replacement to the existing subscriber base. Based on this minimum CET will provide hardware, mobile app, phone and web support, call center and contractor certification, alarm center integration, EMS/Micros integration, retail sales training, marketing support, on-going learning platform and combined services all bundled as a service at a monthly service cost per device.

CET, Control4 and TSTT shall continue to market and aggressively expand the subscriber base via online sales, select TSTT 3rd party retailers and Flagship TSTT retail locations. To this end 3 retail 'starter kits' will be developed as a branded retail product. As these items are added to the subscriber inventory, they will be automatically onboarded onto TSTT RMR platform and added to the CET monthly services inventory.

33.     Cox responded to Rudden's email stating "[e]xcellent [Rudden]" and attached a

separate version of the executive summary that included Cox's "minor amendments":

Excellent Aaron

I've attached some minor amendments to the letter, please sign and send to me by tomorrow.

Thanks
Keino

34.     On September 23, 2020, Rudden spoke with Cox on the phone. During this call,

Cox—representing TSTT—advised Rudden that a company called "MSpace" is to be included in

the Deal. MSpace is a company in Trinidad and Tobago that is owned by an individual named

Charmaine Baptiste.

35.     Rudden met with an MSpace representative the following day and agreed to work together in the Deal. Consequently, CET and MSpace entered into a Memorandum of Understanding dated September 24, 2020, which was to provide the framework for any future binding contract regarding the provision of TSTT security subscriber services between MSpace and CET. Notably, the Services to be provided by MSpace included:

    i.     MSpace will provide the logistics for delivery of the items and on-site service to the individual subscribers.

    ii.    MSpace will provide support for meetings with TSTT to establish and confirm requirements and to prepare documentation required by TSTT to move the project forward

    iii.   MSpace will support the CET loan financing efforts.

36.     Further, the Memorandum of Understanding provided that CET's Services would include:

    i.     CET will contract with Control 4 (Snap One) to provide Control 4 equipment.

    ii.    CET will engage in banking negotiations to facilitate financing.

    ii.    CET will work with TSTT to integrate to TSTT existing central station software.

    iv.    CET will provide ongoing technical training for the call center and field support personnel. A copy is attached as **Exhibit "D."**

37.     On September 29, 2020, Cox notified CET that TSTT wanted to move towards finalizing an agreement.

38.     In January 2021, TSTT provided the first draft agreement between CET, TSTT, and MSpace for the Deal. Between January and late-March 2021, agents for CET, TSTT, and MSpace commented on and made changes to this first draft master contract.

39.     Under the terms of the first draft master contract, and in subsequent draft master contracts circulated amongst the parties to the master contract, CET was entitled to receive a share of the revenue produced by TSTT's home-security systems provided to its subscribers.

40.     On April 6, 2021, Rudden sent an email to the Snap Ones Sales Manager asking that the exclusivity letter be updated and stating that CET received an agreement (the "***Commitment Agreement***") from TSTT to purchase Clare One alarm panels.:

Hi Nicholas,

Further to our chat this project is finally seeing some of the required traction.

I received a letter of commitment from the client (attached) that while not contract was enough to finally start the overdue conversation with the finance partners. This was copied to all TSTT executive boards and is meant to represent a degree of legal commitment.

The customer has been made aware that they now may be subject to price increases and that the product may have a degree of fluctuation as the china assembly industry continues to be somewhat unsettled.

Our letter of exclusivity (attached)  is now over a year old and we would need this extended/updated as it is a requirement for the sole select tender process.

The revenue share contract and the rather exhaustive list of roles and responsibilities still has quite a bit of work to be done but it is finally being given the required attention by the client (first draft was submitted roughly 1 year ago, first answer last week!)

Just to re-clarify the summary of this at this juncture:

- This ultimately has become a "As-a Service" type agreement
- CET is the supply contractor of the product and technical provisioning to TSTT
- CET will aim to provide the advance financing required.
- M Space is the logistics contractor for the project, under CET
- TSTT will be entering into a revenue share agreement for this service provisioning.

Thank you again for your extended and unwavering support for our efforts on this project.

Kindest Regards,

Aaron Rudden, CTS-I CTS-D, EAVA

A copy of this email is attached as **Exhibit "E."**

41.     Rudden attached the Commitment Agreement to the email. The Commitment Agreement is addressed to Rudden and dated April 1, 2021. The Commitment Agreement states that "TSTT would like to place an immediate order for the following panels: One thousand one hundred (1,100) Verizon: CLR-C1-PNL1 with LTE Router [and] Five thousand (5,000) ATT:CLR-C1-PNL1-A[.]" The Commitment Agreement further states that "[a] subsequent agreement would be provided next week, once agreed on, to advise on the order for the accessory components." The Commitment Agreement is signed by Cox. In the email, Rudden explains that the Commitment Agreement was "copied to all TSTT executive boards and is meant to represent a degree of legal commitment." Rudden also explained, in this April 6th email, that the 2020 Dealer Exclusivity Letter "is now over a year old and we would need this extended/updated as it is a requirement for the sole select tender process."

42.     On April 24, 2021, the Snap One Sales Manager responded to Rudden's request that the 2020 Dealer Exclusivity Letter be updated:

| | |
|---|---|
| **From:** | Nick Rosado <nrosado@control4.com> |
| **Sent:** | Saturday, April 24, 2021 3:40 PM |
| **To:** | Aaron Rudden |
| **Subject:** | Fwd: EXTERNAL - Clare/TSTT alarm panel project |
| **Attachments:** | Dealer Exclusivity Letter - AMR900 Updated 4-19-21.pdf |

R/S,
Nicholas Rosado
Area Sales Manager | South Florida
SnapAV + Control4
m. 904.424.9453
e. nrosado@control4.com

---

**From:** Chris Mortorff <cmortorff@snapav.com>
**Sent:** Monday, April 19, 2021 3:28:57 PM
**To:** Clint Choate <clint.choate@snapav.com>
**Cc:** Nick Rosado <nrosado@control4.com>
**Subject:** RE: EXTERNAL - Clare/TSTT alarm panel project

See the updated letter.

11

A copy of this email is attached as **Exhibit "F."**

43.     The Snap One Sales Manager attached the updated dealer exclusivity letter ("*2021*

*Dealer Exclusivity Letter*") to the email shown above. The 2021 Dealer Exclusivity Letter is

identical to the 2020 Dealer Exclusivity Letter, except that the 2021 letter is dated April 19, 2021:

April 19, 2021

**VIA EMAIL**

Christopher Mortorff
Wirepath Home Systems, LLC
11734 S Election Rd,
Salt Lake City, UT 84020 USA
+1 801.619.4272 (Office)
+1 801.523.3199 (Fax)
cmortorff@control4.com

Aaron Rudden
President
Caribbean Entertainment Technologies, LLC
JGWJ+7G San Juan,
Trinidad and Tobago

**Re:  Dealer Exclusivity Letter – Caribbean Entertainment Technologies**

Mr. Rudden,

Wirepath Home Systems, LLC d/b/a Control4 ("Control4") sends this notice confirming that
Caribbean Entertainment Technologies ("CET") is currently the exclusive Control4 dealer for
government telecommunications sales and service in Trinidad and Tobago. As such, CET
provides specialized support in telecommunications subscription products, service provider
sales and support, assistance with government and telecommunications carriers, and related
integration services. Additionally, CET is currently the exclusive provider for Clare-branded
Clare One panel devices, and Control4 is the exclusive provider of Clare products worldwide.

If you, or any of your customers, have questions regarding this notice, please have them reach
out to me through one of the contract methods above.

Best,

Christopher Mortorff
Assistant General Counsel
Wirepath Home Systems, LLC

44.     On April 29, 2021, the Snap One Sales Manager sent an email to Rudden, Baptiste,

and another individual. This email "reiterate[d] [and] confirm[ed]" the business arrangement

between Snap One and CET. The Snap One Sales Manager explained that the 2020 Dealer

Exclusivity Agreement "along with [the 2021 Dealer Exclusivity Agreement]" made CET "**the**

exclusive Control4 [*i.e.*, Snap One] Dealer for government telecommunications sales and services in Trinidad and Tobago." (Emphasis added.) The email explicitly states that "the exclusivity status" between CET and Snap One "remains in place" because "there is a Quote/Order currently about to be processed." He further states that "all orders related to the aforementioned"—*i.e,* the TSTT Deal—"shall be processed through CET":

| From: | Nick Rosado <nrosado@control4.com> |
|---|---|
| Sent: | Thursday, April 29, 2021 11:57 AM |
| To: | Aaron Rudden; Charmaine Baptiste; Shirhan Humphrey |
| Cc: | Finance - AMR Solutions Group; Clint Choate; Brett Price |
| Subject: | Re: EXTERNAL - RE: Clare central station/SIS integration services |
| Attachments: | Dealer Exclusivity Letter - AMR900[1].pdf |
| | |
| Importance: | High |

Greetings all!

To reiterate, confirm, and expand on the below discussion, on 19 February 2020 along with a recent renewal letter, CET was made the exclusive Control4 Dealer for government telecommunications sales and service in Trinidad and Tobago. As such, CET provides specialized support in telecommunications subscription products, service provider sales and support, assistance with government and telecommunications carriers, and related integration services. Additionally, CET is currently the exclusive provider for Clare-branded Clare One panel devices, and Control4 is the exclusive provider of Clare products worldwide.

Understanding there is a Quote/Order currently about to be processed, the exclusivity status remains in place; hence, all orders related to the aforementioned, shall be processed through CET, specifically, Aaron Rudden.

Please email or call with additional questions. Thanks!

A copy of this email is attached as **Exhibit "G."** The Snap One Sales Manager, on behalf of Snap One, thus confirmed the Exclusivity Agreement.

45.     From approximately May 4 until May 14, 2021, CET, TSTT, and MSpace negotiated the agreement for the Deal.

46.     On May 17, 2021, MSpace informed TSTT and CET that it had the right to purchase the hardware directly from Snap One.

47.     This was the first time that CET heard that anyone other than CET had the right to supply Snap One products to TSTT. This was certainly shocking to CET given the Exclusivity Agreement and Snap One's repeated representations that CET was its exclusive supplier.

48.     The night of May 18th, TSTT provided all parties via email with a proposed final, amended master contract. MSpace provided feedback and multiple comments.

49.     The next morning, on May 19, 2021, TSTT acknowledged it had received MSpace's feedback and comments.

50.     Close to midnight, on May 19, 2021, CET submitted a separate version of the master contract to TSTT and MSpace. CET sought certain amendments and clarifications to the proposed final master contract. Namely, the proposed final master contract listed MSpace as "contracted" with Snap One for the supply on this project and CET, while named in some unimportant function, was fundamentally removed from any control or benefit.

51.     In the early morning of May 20, 2021, TSTT responded to CET's request for further amendments and clarifications to the draft master contract. TSTT asked Snap One to provide clarification regarding Snap One's position on "the authori[z]ation status of CET and MSpace as Dealers for the products in Trinidad and Tobago." A copy of this email is attached as **Exhibit "H."**

52.     Per the Exclusivity Agreement, Snap One was contractually obligated to respond by stating that CET was the exclusive supplier of Snap One products for government telecommunications sales and services in Trinidad and Tobago. That did not happen.

53.     About an hour later, Snap One responded to TSTT's request and sent an email to TSTT to make two "clarifications."  A copy is attached as **Exhibit "I."** First, Snap One claimed that "CET has not been granted exclusivity from SnapAV to sell Clare products in Trinidad. Purchases of Clare products do not have to be made through CET. CET is an authorized seller of

14

Clare products." This was a breach of the Exclusivity Agreement and in direct contravention of

the Snap One Sales Manager's April 29, 2021 email.

54.     Snap One also stated that "Mspace has also recently been approved as a Clare dealer

in Trinidad . . . We are confident that Mspace will also be able to meet TSTT's needs for this

project." Again, this breached the Exclusivity Agreement:

Mr. Cox,

I am a member of the SnapAV Legal Team, and lead global sales legal matters, including SnapAV/Control4's exclusive global distribution of Clare products. The below email thread was forwarded to me by our sales team, in relation to in-progress negotiations to provide Clare One panels and associated integration services to TSTT customers in Trinidad. I want to provide a few clarifications on the thread below in the interests of helping TSTT and its partners finalize the agreement:

   1) CET <u>has not</u> been granted exclusivity from SnapAV to sell Clare products in Trinidad. Purchases of Clare products do not have to be made through CET. CET is an authorized seller of Clare products in Trinidad and are a longstanding Control4 and SnapAV dealer known for high-skilled integration services in the US and Caribbean. Mspace has also recently been approved as a Clare dealer in Trinidad and is also an excellent dealer of our products and services. We are confident that Mspace will also be able to meet TSTT's needs for this project.

   2) SnapAV's understanding is that TSTT will contract with Mspace  and that Mspace will separately contract with CET to provide additional assistance and services. We believe the combination of Mspace and CET will help ensure TSTT and its customers receive excellent service and support. However, we do not prescribe a particular go-to-market strategy for TSTT and leave it open to TSTT to determine how best to contract out this project.

Please let me know if you need any additional information or support on SnapAV's end to finalize this agreement. SnapAV and Clare remain very excited for this opportunity to do business with TSTT and provide excellent solutions for the market in Trinidad.

Best,

Chris

Christopher Mortorff | Assistant General Counsel

55.     By the start of the business day on May 20, 2021, CET sent another email to TSTT.

CET stated that "it is willing to execute in good faith once [CET's] suggested amendments are

made" to the master contract. CET requested that five amendments be made. Specifically, CET

requested that language be included in the master contract stating that "CET as the authorized

exclusive dealer for the Manufacturer products and services shall contract with MSpace for the

supply of Clare products and services for the TSTT project. . . ." Additionally, CET requested

language that stated "CET is not aware of any current or future contracting between MSpace and the Manufacturer. CET as the exclusive dealer for The Manufacturer of this project would be the only party contracted with MSpace for these Manufacturer matters." A copy of this email is attached as **Exhibit "J."**

56.     A few hours later, Snap One sent an email addressing CET's suggested amendments. Snap One's Corporate Counsel stated that "CET is not 'the authorized exclusive dealer' of Clare products in Trinidad. . . . [The 2020 Exclusivity Letter] . . . was not a grant of perpetual exclusivity in Trinidad, it was simply a reflection of [Rudden or CET's] role as the only ('exclusive') qualified dealer to sell the ClareOne panels in Trinidad at the time." Snap One ordered CET to "cease and desist from making any such representations" regarding CET's dealer exclusivity status for the products. This email also stated that "[t]here is no requirement that TSTT/Mspace purchase through CET. So, currently, there are two qualified authorized ClareOne panel providers in Trinidad." A copy of this email is attached as **Exhibit "K."** Again, this breached the Exclusivity Agreement.[1]

57.     Snap One was ready, willing, and able to consummate the Deal with its proposed amendments. But for Snap One's unlawful conduct, the Deal would have been consummated with CET's proposed amendments.

58.     Ultimately, CET's final suggested amendments to the master contract were rejected, solely as a result of Snap One's unlawful conduct, including by allowing MSpace to become the dealer for the products involved in the Deal.

59.     MSpace signed a version of the master contract that did not incorporate CET's suggested changes and returned it to both TSTT and CET. However, CET advised TSTT and

---

[1]     This email falsely characterizes statements made by Snap One to CET.

MSpace that it was unable to sign because that version of the master contract "removed CET as the exclusive dealer of the manufacturer's products."

60.     Thereafter, TSTT engaged directly with MSpace and Snap One for the supply of Snap One hardware and related services, in violation of the Exclusivity Agreement, and CET was removed from the Deal.

## COUNT I – BREACH OF CONTRACT

61.     CET incorporates the allegations in paragraphs 1 through 60.

62.     CET and Snap One entered into the Exclusivity Agreement, a valid and enforceable contract whereby CET was made the exclusive dealer of Snap One's hardware, including Claire Controls products, for the Deal.

63.     Snap One breached the Exclusivity Agreement by, without limitation, granting MSpace authorization to sell Snap One's hardware and denying that CET was the exclusive dealer of the hardware for government telecommunications sales and services in Trinidad and Tobago just prior to the Deal's closing date.

64.     Snap One's conduct directly and proximately caused CET millions of dollars in damages.

WHEREFORE, CET requests a judgment for damages, costs, pre- and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT II – BREACH OF IMPLIED-IN-FACT CONTRACT

### (In the Alternative to Count I)

65.     CET incorporates the allegations in paragraphs 1 through 60.

66.     CET and Snap One's actions throughout the relevant time period indicate that they entered into a valid and enforceable contract whereby CET was to purchase hardware from Snap One and CET was to serve as the exclusive dealer of Snap One's hardware for the Deal.

67.     The parties' mutual assent to this contract is evidenced by, among other things, the 2020 and 2021 Dealer Exclusivity Letters, the Snap One Sales Manager's April 29, 2021 email, and by CET working for nearly 18 months to finalize the Deal.

68.     Snap One breached this implied-in-fact contract by, for example, granting MSpace authorization to deal Snap One's hardware and denying that CET was the exclusive dealer of the relevant hardware for government telecommunications sales and services just prior to the Deal's closing date.

69.     Snap One's conduct directly and proximately caused CET millions of dollars in damages.

WHEREFORE, CET requests a judgment for damages, costs, pre- and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT III – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (In the Alternative to Count I)

70.     CET incorporates the allegations in paragraphs 1 through 60.

71.     Snap One undertook a covenant of good faith and fair dealing pursuant to the Exclusivity Agreement.

72.     The Exclusivity Agreement required that CET be the exclusive dealer of the hardware for the Deal.

73.     Snap One and CET's reasonable expectation was that CET would remain the exclusive dealer for the entirety of the Deal.

74.     To the extent there is an ambiguity regarding the date on which the exclusivity terminated, the Exclusivity Agreement provided Snap One with substantial discretion regarding the termination date.

75.     In this circumstance, the implied covenant of good faith and fair dealing required Snap One to use this discretion in compliance with the parties' reasonable expectations.

76.     The parties reasonably expected that the Exclusivity Agreement would remain in place until the Deal was finalized, as evidenced by, among other things, the Snap One Sales Manager's April 29, 2021 email.

77.     Snap One breached the implied covenant of good faith and fair dealing when it permitted MSpace to be a dealer of the hardware for the Deal, thereby exercising its discretion in a manner that was contrary to the parties' reasonable expectations.

78.     Snap One's conduct directly and proximately caused CET millions of dollars in damages.

WHEREFORE, the Plaintiff requests a judgment for damages, costs, pre- and post-judgment interest, and any other relief the Court deems just and proper.

## <u>COUNT IV – UNJUST ENRICHMENT</u>

### (In the Alternative to Counts I, II, and III)

79.     CET incorporates the allegations in paragraphs 1 through 60.

80.     CET conferred a benefit on Snap One, which Snap One had knowledge of, by bringing Snap One into the Deal with TSTT.

81.     CET did not confer this benefit gratuitously but intended to profit from the Deal by serving as the exclusive dealer of Snap One's hardware for government telecommunications sales and services in Trinidad and Tobago.

82.     CET voluntarily accepted and retained the benefit by engaging in the Deal.

83.     The monies that Snap One received or is receiving in exchange for providing its hardware as part of the Deal are measurable.

84.     The circumstances are such that it would be inequitable for Snap One to retain this benefit without paying the value thereof to CET because Snap One would not have received this benefit without CET initiating and arranging the Deal with TSTT.

WHEREFORE, the Plaintiff requests a judgment for damages, costs, pre- and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT V – TORTIOUS INTERFERENCE

85.     The Plaintiff incorporates the allegations in paragraphs 1 through 60.

86.     CET had a business relationship with TSTT. CET and TSTT's business relationship is evidenced by, among other things, CET's extensive negotiations, communications, and meetings with TSTT over the span of approximately 18 months.

87.     At all relevant times, Snap One knew about the business relationship between CET and TSTT because, among other things, CET informed Snap One about the Deal in January 2020 and Snap One acknowledged the existence of the business relationship in emails that Snap One sent to TSTT and Snap One.

88.     Snap One intentionally and unjustifiably interfered with the business relationship between CET and TSTT by cutting Snap One out of the Deal. Specifically, Snap One, near the eve of the Deal's closing, represented to TSTT that CET was not the exclusive dealer of the hardware for government telecommunications sales and services and acted to replace CET in the deal by granting MSpace authorization to provide the hardware.

89.     Snap One interfered using improper means and thus is not protected by the competition or any other privilege.

90.     Snap One's actions induced TSTT to end its business relationship with CET by engaging directly with MSpace to provide the hardware and services for the Deal.

91.    64.    Snap One's conduct directly and proximately caused CET millions of dollars in damages.

WHEREFORE, CET requests a judgment for damages, punitive damages, costs, pre- and post-judgment interest, and any other relief the Court deems just and proper.

## COUNT VI – UNFAIR COMPETITION

92.    CET incorporates the allegations in paragraphs 1 through 60.

93.    CET and Snap One are in the business of supplying of home security system hardware to a common pool of customers.

94.    Snap One made false statements to CET regarding CET's status as the exclusive dealer of the hardware, which constitutes unfair competition and is contrary to honest practice in commercial matters.

95.    CET acted in reasonable reliance on Snap One's false statements.

96.    CET expended considerable time, labor, and money over the course of approximately 18 months initiating the Deal and attempting to close the Deal, while acting under the reasonable belief that it was the exclusive dealer of the hardware for the deal.

97.    Snap One's conduct directly and proximately caused CET millions of dollars in damages.

WHEREFORE, CET requests a judgment for damages, including punitive damages; attorneys' fees and costs; and any other relief the Court deems just and proper.

## COUNT VII – CONSTRUCTIVE FRAUD

98.    CET incorporates the allegations in paragraphs 1 through 60.

99.    CET and Snap One had a confidential relationship, under which they shared confidential details about the Deal as part of working together to consummate the Deal.

100.    Snap One abused this confidential relationship and took an unconscionable advantage by misleading CET about Snap One's status as the exclusive dealer of the hardware for government telecommunications sales and services in Trinidad and Tobago and concealing information about Snap One's negotiations and discussions with MSpace.

101.    Snap One's conduct directly and proximately caused CET millions of dollars in damages.

WHEREFORE, CET requests a judgment for damages, including punitive damages; attorneys' fees and costs; and any other relief the Court deems just and proper.

## JURY DEMAND

CET demands a trial by jury on all issues so triable.

Dated: November 2, 2021

 s/Eric W. Ostroff
Eric. W. Ostroff, Esquire
Florida Bar No: 10130
eostroff@melandrussin.com
MELAND BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221

-and-

s/Jonathan W. Segal
Jonathan W. Segal, Esquire
Florida Bar No: 947830
jsegal@segalpa.com
JONATHAN W. SEGAL, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 374-3555
Facsimile: (305) 397-2539

*Attorneys for the Plaintiff*